# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTINE RYLISKIS,        )
                          )        Civil Action No. 11-1517
            Plaintiff,        )        United States Magistrate Judge
     v.                    )        Cynthia Reed Eddy
                          )
UNIONTOWN AREA HOSPITAL,   )
                          )
        Defendant.     )
                          )

## MEMORANDUM OPINION

Presently before the Court is Defendant's Motion for Summary Judgment, with brief in support [ECF Nos. 34 and 35] and Plaintiff's brief in opposition [ECF No. 40]. After careful consideration of Defendant's motion, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that there is not sufficient record evidence upon which a reasonable jury could return a verdict for Plaintiff, Christine Ryliskis, on her race-based hostile work environment claim. Therefore, for the reasons that follow, the Motion for Summary Judgment will be granted.

## Procedural Background

Plaintiff, Christine Ryliskis ("Ryliskis" or "Plaintiff"), a former employee at Uniontown Area Hospital ("the Hospital" or "Defendant"), filed a three-count federal Complaint. In Count I, she alleged that she was subject to a hostile environment based on race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e – 2000e-17 (2008). In Count II, Plaintiff alleged retaliation, also in violation of Title VII. Count III, brought pursuant to the Pennsylvania Human Relations Act, mirrored the allegations set out in Counts I and II. On August 30, 2012, the Court issued a Report and Recommendation recommending that Court II be dismissed without

prejudice and that Court III be dismissed with prejudice. [ECF No. 13]. Neither party filed objections to the Report and Recommendation which was adopted by the District Court on September 10, 2013. Thereafter, both parties consented to give the undersigned full authority to conduct all proceedings in this case, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c)(1). [ECF Nos. 17, 22].

Plaintiff did not attempt to revive Court II via an Amended Complaint; therefore, only Count I remains. Defendant filed a Motion for Summary Judgment on May 14, 2013. [ECF No. 34]. For the reasons stated below, Defendant's Motion will be granted.

**Factual Background**

As the law requires, all disputed facts and inferences are to be resolved most favorable to Plaintiff, the non-moving party.

Plaintiff was employed by the Hospital as an operating room technician from April 2001 until March 24, 2011, when she alleges she was constructively discharged. She alleges that beginning in 2004, she experienced a racially hostile work environment. The first alleged incident occurred when Plaintiff overheard a coworker's phone conversation, in which the coworker said that she was not someone's "n-----."[1] [ECF No. 42-1 at pp. 21-23].[2] The coworker was not speaking to Ryliskis, nor is there evidence that she knew that Ryliskis was nearby. [Id.]. Ryliskis reported this incident to Linda Kunkel ("Kunkel"), director of the surgical suite and central sterile departments. [ECF No. 42-1 at p. 21]. Plaintiff does not recall Kunkel's response, or that the two discussed the matter again. [Id. at p. 24]. Kunkel does not recall that Plaintiff ever reported the incident. [ECF No. 37-6 at p. 10]. Plaintiff did not file a charge of discrimination regarding that incident, nor did she file a grievance with her union steward. [ECF No. 42-1 at pp. 25, 27].

---

[1] The speaker used a racial slur commonly referred to as the "n-word."

[2] Page references are to deposition transcript pagination.

Plaintiff stated that after speaking with Kunkel, she was "repeatedly harassed" by one of the operating room team leaders, Renee Lazuka ("Lazuka"). [ECF No. 42-1 at p. 27]. Ryliskis alleges that Lazuka used a tone of voice that was belittling. Ryliskis also complains that Lazuka once refused to let an RN cover for her during a scheduled vacation and denied permission for her leave work early on one day, insisting that she help aides stock supplies. [Id. at pp. 29-31]. Ryliskis stated that she reported Lazuka's behavior to team leader, Sandra Georgiana ("Georgiana").

Ryliskis states that the next racially motivated incident occurred two years later in 2006. Dr. Jack Kraus, the head of anesthesia, "almost pushed her flat on her face in front of a bunch of nursing students," when he was on his way to the intensive care unit. [ECF No. 37-2 at p. 62]. She considered this to have been racially motivated because: "Because he tried to hurt me, and belittle me in front of a bunch of nursing students. And besides that, he tried to run me over with his car in the parking lot after that, and when I would walk in the break room he would shut up. He never had nothing to say to me." [Id.]. She did not report this incident to her supervisor. [Id. at p. 62-63].

The incident at the crux of Plaintiff's case occurred four years later, on April 24, 2010, while she was assisting in a same-day operating procedure with gastroenterologist, Dr. Fraser Stokes ("Stokes"). [ECF No. 42-1 at pp. 37, 41-47]. Dr. Stokes is not a hospital employee. [ECF No. 42-6 at p. 18]. Rather, Dr. Stokes is a member of a practice group called Southwestern GI. The practice group members have staff privileges at the Hospital. [ECF No. 36, par. 12]; [ECF No. 41, par. 12].

During the procedure, the song "Lady Marmalade" came on an operating room radio. Stokes allegedly sang a portion of the song containing the words "soul sista." Plaintiff also states that Stokes danced like a gorilla while singing. [ECF No. 42-1 at p. 47]. Stokes counters that he sang "to elevate the tone of the room because it was a busy day with lots of cases." [ECF No. 41 at par. 180]. While he admits to dancing, he denies dancing like a gorilla. [Id.at par. 85]. He agrees that

such dancing would be offensive to African Americans. [Id. at par. 189]. He also asserts that he did not believe that the song was "about black people." [ECF No. 42-3 at p. 16].

Ryliskis testified: "As I am trying to ignore him, he called out my name. Hey, Chrissy, you should be singing that song. When he said that, both individuals in the room, which are white, looked at me and I was very degraded. I was – I have never been the same since." [ECF No. 42-1 at pp. 46-47]. Stokes asked Plaintiff why she looked sad, and was so quiet. Ryliskis told him that she was tired of being harassed. [Id. at p. 90]. Stokes asked if someone in the room was harassing her, and Plaintiff answered, "[N]o, because [Stokes] was arguing with me." [Id.]. After that, Stokes was "nasty the rest of this case." [Id. at p. 92.]. "He added on about three more cases . . . and tried to make my life really miserable that day." [Id. at p. 93]. Ryliskis admitted that having cases added to a day's work "happens all the time," that the other employees were required to remain, and that she was paid for her time. [Id. at pp. 94-95]. Plaintiff also admitted that she had performed hundreds of procedures with Stokes and he had never acted like this before. [Id. at pp. 45, 47].

On Monday, April 26, 2010, Plaintiff told her team leader, Georgiana, about the incident with Stokes. [Id. at p. 48]. Georgiana advised Ryliskis to speak to Kunkel, saying that she would do the same. [Id. at p. 49]. On April 27, 2010, Plaintiff met with Kunkel and related the Stokes incident. Ryliskis told Kunkel that she had been offended by Stokes' comments and the way he was dancing like a gorilla. [ECF No 42-5 at pp. 17, 21].

Kunkel documented the meeting with Ryliskis:

> I spoke with Chris and told her I was sorry for what happened and that I ha[d] to pursue reporting her complaint. I asked her to write up the incident . . . and the conversations . . . between her and Dr. Stokes. Chris informed me she was planning on reporting the incident to her union steward. I reported Chris's complaint to [Rock, who] called Human Resources to notify them. Several days later Chris provided me with her notes . . . and I then gave [them] to . . . Rock.

[ECF No. 37-6 at p. 17]. Ryliskis delivered a letter to Kunkel, dated April 28, 2010, describing the

incident in part, as follows:

> This incident along with other uncountable remarks and gestures (such as farting at or towards me) leave me with a feeling of sadness and discomfort. His gorilla-like gestures are aimed toward the fact that I am African-American and are completely unacceptable anywhere, but especially in the workplace. Because of his higher authority, I feel belittled and intimidated because of his unprofessional behavior. I do not feel that I am being treated as an equal or a valued member of the time.
>
> I am confident that there can be a solution to this problem of a hostile workplace. Thank you for your time and effort in looking into this problem and finding a resolution.

[ECF No. 42-8 at p.1].

Ryliskis alleges that Kunkel "harassed" her for about two weeks to supply more detail. [ECF

No. 42-1 at p. 53]. "[Kunkel] pulled me off my job and make me go sit in her office and write the

rest of this, and I wasn't allowed to work until I got done, because Kaminsky wanted it in HR." [Id.].

Ryliskis completed the supplement "about three or four weeks, almost a month maybe" later. [ECF

No. 37-2 at p. 87]. On the back of her original complaint, Ryliskis wrote:

> And then I said Dr. I Think that was very inappropriate and unprofessional & How u like it would if I was singing play that funky music white boy. Had 3 more cases to go and Dr. Stokes was asking me why I was looking so sad and why I was being quiet. I Told Him I was tired of coming to work and being Harassed. Just want to come to work and Do a Good job & take Care of pt. Then he ask me if someone in the Room was Harassing me and I said no only Because He wanted to keep Arguing with me & pt. was in the Room. Told my Director on Tuesday when I seen her.

[ECF No. 42-8 at p.2].

James Proud ("Proud"), the Hospital's Vice-President of Human Resources, learned of the

interaction between Stokes and Ryliskis on "approximately April 28th through Joann Kaminsky

('Kaminsky')" from Human Resources. [ECF No. 42-6 at p. 5]. Proud recalls that he saw Ryliskis' original letter "within a day or two of when it was written." [Id.]. Proud received the supplemented version "quite some time . . . after the 28th." Proud did not remove Plaintiff from her position, believing that because of Ryliskis' union membership, she could not be moved to another position. [Id. at p. 18].

Proud presented the matter to his superior, Paul Bacharach ("Bacharach"), [ECF No. 42-6 at p.12], President and CEO of Fayette Regional Health System, the Hospital's controlling entity. [ECF No. 37-4 at p. 8]. Proud went to Bacharach because Plaintiff's complaint involved a physician who was not a Hospital employee. [ECF No. 42-6 at p. 18]. Proud was "comfortable" he "communicated to [Bacharach]" what Ryliskis alleged. [Id. at p. 24]. Proud recalled that he gave Bacharach a copy of Plaintiff's letter and that Bacharach understood that he had "an employee making serious allegations of race discrimination." [Id. at pp. 27, 34]. However, Proud testified in his deposition that Bacharach may not have been specifically aware that Stokes had been accused of dancing like a gorilla.

Stokes and Bacharach met on June 1, 2010. [ECF No. 42-6 at p. 29]. Bacharach accepted Stokes' version of the facts, believing that Ryliskis had misconstrued the incident, and that Stokes would apologize. "At that point . . . human resources [was] to follow through on the investigation and determine whether there was anything more that needed to be done." [ECF No. 42-2 at p. 50].

Following his meeting with Bacharach, Stokes met with Ryliskis. He told her that he did not intend to offend her and that he respected her. [Doc. 37-2 at p. 73]. Stokes notified Bacharach that he had spoken and apologized to Ryliskis.

Bacharach did not speak with Ryliskis, nor did he know whether anyone in Human Resources relayed the investigation results to her. [ECF No. 42-2 at 50]. The Hospital did not

receive additional complaints about Stokes' behavior and Ryliskis did not seek to meet with anyone in Human Resources regarding Stokes' behavior. Further, the summary judgment record does not reflect that, at any point during the investigative process did Ryliskis voice continuing concerns about Stokes nor did she report additional incidents in which he was involved. Proud testified as follows:

> Q.     Besides having a conversation in which Doctor Stokes denied the conduct, what action did the hospital take?
>
> A.     Our action was limited to focusing on Doctor Stokes and making him aware of the impact of his behavior, the perceived impact of his behavior.
>
> Q.     Did that satisfy [Plaintiff]?
>
> A.     I thought it did.
>
> Q.     What made you think that?
>
> A.     Because we didn't receive any more complaints, we didn't have any grievance filed. We had no feedback from Chris until August where in a meeting on another subject she said everything was fine.

[ECF No. 37-8 at pp. 36-37].

In July, 2010, the Hospital initiated a comprehensive nine month non-discrimination anti-harassment training program for all non-physician employees. Physician training occurred during medical section meetings, beginning on January 1, 2011. [ECF 37-8 at pp. 45-46]. The record shows that Stokes attended training on Wednesday, January 5, 2011. [ECF No. 37-4 at p.25].

In August 2010, Ryliskis met with Joann Kaminsky ("Kaminsky") of Human Resources and Kunkel, complaining that an employee in environmental services was harassing her. "[The employee] was coming around [Plaintiff's] room, singing that song, nudging [her]." [ECF No. 42-1 at p. 64]. Plaintiff refused to divulge the woman's identity because the woman and Ryliskis

socialized together. Ryliskis also testified that this individual was a "big bully on the floor and [Ryliskis] did not want to be harassed . . . She was already pushing [Ryliskis] around." [Id. at p. 69].

Kunkel's undated notes reflect that she and Ryliskis went to Human Resources to discuss the incident involving the unidentified worker. Kunkel wrote:

> Joann had asked her how everything was going now. Chris responded "pretty good." She then proceeded to say that Dr. Stokes apologized to her and said he did not mean to hurt her feelings. She said he has been kind towards her and brought the staff donuts one day.

[ECF No. 42-9 at p. 1]. Ryliskis disputes telling Kaminsky that things were going better and that Stokes had been kind to her. [ECF No. 42-7 at p. 1]. She states in an Affidavit dated June 20, 2013 that in response to a general question from Kunkel, she gave a "general response" that she was "ok." [Id.]. "I did mention that Dr. Stokes had apologized to me, and that he had brought donuts for the staff. I never told her that the relationship between he and I was good, or anything like that." [Id.].

Kunkel's notes from the same meeting also document that Ryliskis told Kaminsky about the unidentified housekeeping attendant humming the same song and shoving her when they inadvertently went through a door at the same time. [ECF No. 42-9 at p. 1]. Kaminsky informed Ryliskis that staff education was in order "since they may be totally unaware of what had happened with Dr. Stokes. Chris said all of the staff knows. . . ." [Id.]. According to Kunkel's notes, Kaminsky said that the "song might very well come back on the radio and someone may reference they like the song and this person will be innocent and [Ryliskis] might very well take offense to it." [Id. at p. 2]. She stressed that "this is why education to the staff is so very important

 . . . [P]eople can be totally unaware of what they are saying or doing and then it ends up offending people unknowingly." [Id.]. Ryliskis persisted in refusing to name the employee. After the meeting,

Plaintiff expressed disappointment that Kaminsky had not found her a different job; Kunkel replied that this had not been the objective of the meeting. [Id.].

In September 2010, the song was again part of what Ryliskis characterizes as racial discrimination. Plaintiff was suctioning a scope where Joe Yuhas ("Yuhas"), a nurse anesthetist, was present. [ECF No. 42-1 at pp. 78-79]. At her deposition, Ryliskis stated: "It is pretty loud when you are suctioning the scope. You can't hear what is on the radio." [Id.]. Yuhas, however, was able to tell that "Lady Marmalade" was playing, and asked Plaintiff to turn it up. Plaintiff stated that she turned the radio off, and she and Yuhas "had words." [Id. at pp. 79, 81]. The day before, Yuhas had worked with Kraus, the doctor who allegedly pushed Ryliskis. [Id. at p. 80]. Ryliskis assumed that Yuhas learned then about her run-in with Stokes from Kraus. Plaintiff reported the incident to Kaminsky, "[Yuhas] heard that song on the radio while I was suctioning my scope. And he knew. He is an agitator. He knew I would have taken offense to it." [Id. at p. 82].

Afterward, Kaminsky met with Yuhas, explaining that Plaintiff found the song offensive. [ECF No. 42-4 at p. 35]. Yuhas stated that he liked the song, and was unaware of the Stokes incident. [Id. at pp. 37, 29]. Yuhas also objected to certain songs played in the operating room, and suggested to Kaminsky and to Kunkel's boss, Betty Ann Rock ("Rock"), Chief Nursing Officer and Vice President of Nursing, that radios be banned. [Id. at pp. 29-30].

Ryliskis states that at some point in the summer of 2010, she was insulted when she was called "Crispy" instead of "Chrissy," by a fellow operating room technician. [ECF No. 37-1 at p. 60]. Ryliskis "stood up for [herself]." [Id.]. "That is what I was told to do through human resources, and I went to her and told her I didn't appreciate her calling me this Crispy." [Id.]. "Joann Kaminsky and Linda Kunkel told me to stick up for myself. If they were going to sing a song to me or

whatever. There was a lot of things that I didn't report . . . because I tried to stick up for myself, sir." [Id.]. Ryliskis did not report the alleged incident. [Id. at p. 61].

On September 17, 2010, Plaintiff was injured and did not return to work until the end of December. [ECF No. 1 ¶20] While on leave, she filed racial discrimination charges with the PHRC and the EEOC ("Charge 1"). [Id. ¶15]. The EEOC issued a right to sue letter on August 31, 2011 [ECF No. 4 -2]. On November 16, 2011, Plaintiff filed a second dual charge with the PHRC and the EEOC, alleging racial discrimination and retaliation ("Charge 2"). [ECF No. 7-2]. Thirteen days later, Plaintiff filed this action. [ECF No. 1].

**Standard of Review**

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, (1986). To defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In reviewing a motion for summary judgment, the court does not make credibility determinations and "must view facts and inferences in the light most favorable to the party opposing the motion." Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir.1995).

**Discussion**

**Count I – Title VII – Hostile Work Environment Based on Race**

In Count I of her Complaint, Ryliskis brings a racially hostile work environment claim against the Hospital under Title VII. [ECF No. 1 at ¶35]. To establish a <u>prima facie</u> case, a plaintiff must demonstrate (1) that she suffered intentional harassment based on race; (2) the harassment was severe or pervasive;[3] (3) the harassment detrimentally affected her; (4) the harassment would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability. <u>Griffin v. Harrisburg Prop. Servc., Inc.</u>, 421 F. App'x 204, 207 (3d Cir. 2011).

In assessing whether a plaintiff has established a hostile work environment for purposes of Title VII, courts consider the totality of the circumstances. These include the frequency of the alleged discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance. Conduct that is merely offensive or that makes the employee's life at work unpleasant or uncomfortable is insufficient. <u>Owens v. Allegheny Valley Sch.</u>, 869 F. Supp. 2d 653, 660 (W.D. Pa. 2012). In carrying out this analysis, courts must "concentrate not on individual incidents, but on the overall scenario." <u>Mandel v. M & Q Packaging Corp.</u>, 706 F.3d 157, 168 (3d Cir. 2013) (quoting <u>Carver v. City of Trenton,</u> 420 F.3d 243, 262-63 (3d Cir. 2005)).

**Plaintiff Has Established That Stokes' Conduct Created A Hostile Work Environment**

Against the background of the law, the Court turns to the totality of Plaintiff's hostile work environment claim. The claim as a whole is comprised of approximately seven (7) incidents which

---

[3]  In 2006, the United States Court of Appeals for the Third Circuit adopted the "severe *or* pervasive standard." <u>Jensen v. Potter,</u> 435 F.3d 444, 449 n. 3 (3d Cir. 2006), overruled in part on other grounds by <u>Burlington N. & Santa Fe Ry. Co. v. White,</u> 548 U.S. 53 (2006).

occurred over a seven (7) year time span (2004 – 2010), all of which have been described in detail *supra*. The following three incidents occurred between 2004 and 2006. First, Plaintiff complains that in 2004 she overheard a coworker's use of the "n-word" in a private phone call. Second, she claims that she was "harassed" by one of her supervisors, Lazuka, for reporting the telephone incident. Lazuka spoke to Ryliskis in a belittling manner, refused to let an RN cover for her, and declined to let her leave early one day, asking her to stay and help aides stock supplies.[4] Third**,** in 2006, anesthesiologist Kraus allegedly ran into Plaintiff, tried to hit her with his car, and did not speak to her.

The remainder of Count I is comprised of four incidents, all of which allegedly occurred in 2010: (1) Stokes' operating room behavior; (2) an environmental coworker's singing the "Lady Marmalade" riff;[5] (3) a coworker calling Ryliskis "Crispy" instead of Chrissy; and (4) a coworker's request to turn up the volume of the radio in the operating room when "Lady Marmalade" was playing.

The question confronting the Court is whether, these incidents as a whole, in some combination, or any standing alone, suffices to establish a hostile work environment for purposes of summary judgment. In answering this question, the Court cannot limit its analysis to individual instances of harassment, but must instead "view the record as a whole picture" because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance."

---

[4]  The remainder of the allegations pertaining to Lazuka were raised in Count II, the retaliation count, which has been dismissed.

[5]  Although Ryliskis reported this incident to Kaminsky, she refused to identify the employee. The importance of identifying the employee was explained in detail by Kaminsky. [ECF No. 42-9]. When Plaintiff again refused to name the alleged harasser, she was counseled with respect to how to handle these types of incidents in the future. Because Plaintiff refused to participate in the process in place for handling this complaint of coworker discrimination, she cannot "establish the existence of a genuine issue of material fact regarding employer liability [based on this incident]." Griffin v. Harrisburg Prop. Serv., Inc., No 10-1053, 2011 WL 1227784 at *3 (3d Cir. April 4, 2011).

Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276 (3d Cir. 2001) (quoting Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir.1990)).

First, the Court concludes that no reasonable juror could find that the events which allegedly occurred prior to 2010 constituted harassment or can be viewed as having contributed to a hostile work environment. Although Plaintiff has put forth evidence of a number of unpleasant incidents which occurred prior to 2010, the Court finds that Plaintiff has failed to show issues of fact which would preclude summary judgment.

In 2004, the "n-word" was uttered by a coworker on the telephone in an empty operating room. There is no evidence to indicate, however, that the speaker knew that Ryliskis was in the vicinity, or that the speaker was referring to Plaintiff. In determining the existence of a hostile work environment "stray remarks by non-decision makers . . . are rarely given great weight." Ezold, v. Wolf, Block, Schoor and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992). While this overheard comment was undoubtedly inappropriate, the Court finds that a reasonable jury could find that Plaintiff has failed to show that the remark was anything other than an offensive utterance or that the remark was directed towards Plaintiff.

This conclusion equally applies to Plaintiff's allegation that after reporting the incident, she was "repeatedly harassed" by one of her coworkers, Renee Lazuka ("Lazuka"). [ECF No. 37-1 at p. 27]. There is nothing about the alleged harassment involving Lazuka to suggest that it was racially motivated.

The same is true of Plaintiff's alleged 2006 difficulties with anesthesiologist Kraus. As Chief Judge Conti of this District has observed: "In order to defeat a motion for summary judgment, a plaintiff seeking to advance a hostile work environment claim must present some evidence indicating that the harassing conduct of which he or she complains can be traced to her statutorily

protected trait." <u>Hubbell v. World Kitchen, LLC,</u> 688 F. Supp. 2d 401, 419 (W.D. Pa. 2010). Furthermore, fatal to this allegation is that by Plaintiff's own admission she did not report this incident to her supervisor.

The next incident of alleged harassment took place approximately four years later when Plaintiff was in the operating room with Stokes and the song "Lady Marmalade" came on the radio. When the Court looks at this incident, it finds, albeit narrowly, that for purposes of stating a claim based on hostile work environment, a reasonable fact finder could conclude that this single incident was sufficiently severe to sustain the claim. "Evidence of an isolated or single incident of harassment, [which is] *extremely serious*, [may] establish a hostile work environment." <u>Volk v. Sch. Dist. of Philadelphia,</u> Civil Action No. 12-1432, 2013 WL 607843 at *10 (E.D. Pa. 2013) (citing <u>Carver v. City of Trenton,</u> 420 F.3d 243, 262-63 (3d Cir. 2005)) (emphasis added). This does not mean that a plaintiff must show "that the conduct affected [her] well-being or caused physical injury." <u>Lake v. AK Steel Corp.,</u> No 2:03CV517, 2006 WL 1158610 at * 41 (W.D. Pa May 1, 2006) (citing <u>Harris v. Forklift Systems, Inc.,</u> 510 U.S. 17, 21 (U.S. 1993)). "Whenever the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment." <u>Id.</u> (quoting <u>Torres v. Pissano,</u> 116 F.3d 625, 631-32 (2d Cir. 1997)). However, "ordinary tribulations of the workplace" such as "sporadic use of abusive language" or "generally boorish behavior" does not constitute a hostile work environment." <u>Vance v. Ball State Univ.,</u> -- U.S.--, 133 S. Ct. 2434, 2455 (2013).

Although, as the Court has said, it perceives this to be a close case, it concludes that a reasonable jury could find that Stokes' conduct had a detrimental effect on Plaintiff or that a reasonable person in Plaintiff's position would have been detrimentally affected by the same

conduct. Thus, Plaintiff could satisfy the third and fourth elements of a hostile work environment claim at trial. This is enough to require the Court to turn to the final element of Plaintiff's claim based on hostile work environment; is there a basis upon which to hold the Hospital liable for Stokes' conduct?[6]

**The Hospital's Liability Based on Stokes' Conduct[7]**

The basis of an employer's liability for a hostile work environment claim depends on the employment relationship between the harasser and the harassed. This precept was explained by the United States Supreme Court in its recent decision in <u>Vance v. Ball State Univ.</u>, -- U.S. ---, 133 S.Ct. 2434 (2013). When the alleged harasser is a "supervisor," and the harassment results in a tangible employment action,[8] the employer is strictly liable. However, if the alleged harasser is the victim's coworker or other non-supervisor, the employer will be liable only if it was negligent in its control of working conditions. "In that scenario, *the plaintiff* 'must demonstrate that the employer failed to provide a reasonable avenue for complaint,' or that the employer was aware of the

_____

[6] In limiting discussion to this single incident, the Court has not ignored instances of harassment by other coworkers alleged to have occurred after the operating room event. These include a coworker calling Ryliskis "Crispy" instead of "Chrissy," a different unidentified coworker humming "Lady Marmalade" in Plaintiff's presence coupled by an unwanted nudge, and a third coworker's request that the same song be turned up when it was difficult to hear the radio in the operating room. The Court does not find these instances, even when taken together with all of the other evidence, sufficient to establish racial harassment. More fundamentally, in none of these instances does Plaintiff cite evidence in the record to suggest that the conduct of these coworkers was motivated by racial animus.

[7] The Court need not address Plaintiff's theories of liability based on the conduct of Kunkel, Lazuka, Georgiana, or Kaminsky. Every one of the incidents involving these employees is alleged to have been motivated by retaliation. [ECF No. 44 at p. 2]. Given that the retaliation claims have been dismissed, Plaintiff has failed to establish any theory or cite any law supporting the continued relevance of the allegations.

[8] A "tangible employment action involves a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Vance,</u> 133 S. Ct. at 2443 (quoting <u>Burlington Indus. v. Ellerth,</u> 524 U.S. 742, 761 (1998)).

harassment and nevertheless declined to 'take appropriate remedial action.'" Phillips v. Donahoe, Civil Action No. 12-410, 2013 WL 5963121 at *8 (Nov. 7, 2013) (quoting Weston v. Pennsylvania, 251 F.3d 420, 427 (3d Cir. 2001)) (emphasis added). This same standard has been held applicable to cases involving harassment by a non-employee. Faragher, 524 U.S. 789; Frank v. Harris, 118 F. App'x 799 (5th Cir. 2004).

Plaintiff admits that Stokes was not an employee of the hospital and, thus, "the Supreme Court's holding in Vance takes Dr. Stokes' conduct out of the realm of strict liability." [ECF No. 44 at p. 2]. Consequently, Plaintiff cannot prevail without establishing that the Hospital was negligent. Vance, 133 S.Ct. at 2451–53.

According to Plaintiff, the record shows that the Hospital was "negligent for failing to take any remedial action of any kind" in response to Plaintiff's claims that she was the victim of racism. [Id.]. The Court finds, however, that the undisputed chronology of events following Plaintiff's negative encounter with Stokes establishes that this is not the case.

On the basis of the existing record, the Hospital is entitled to summary judgment in accordance with the standard set forth in Knabe v. Boury Corp., 114 F.3d 407 (3d Cir.1997). There, the United States Court of Appeals for the Third Circuit declared that an employee seeking to hold an employer liable under Title VII for a "hostile work environment" created by a non-supervisory coworker must demonstrate that the employer failed to take remedial action that was "reasonably calculated to prevent further harassment" of the victimized employee after learning of the coworker's misconduct. Knabe, 114 F.3d at 412. Under this standard, any remedial action that effectively stops the offending employee from harassing the victim is considered to be "adequate as a matter of law." Id., at n.8. Given that Ryliskis was not subjected to further harassment by Stokes after reporting his behavior, she cannot establish that the Hospital was negligent in handling the situation. See Huston

v. Proctor & Gamble Paper Products Corp., 568 F.3d 100, 110 (3d Cir. 2009). The standard articulated in Knabe and Huston is supported by the Court of Appeals' decision in Peace-Wickham v. Walls, No. 09-4690, 2010 WL 5166387 (3d Cir. 2010):

> "Under Title VII, much turns on whether the harassers are supervisors or coworkers . . ." [A]n employer will be liable for harassing conduct committed by a victim's coworker[ ] if the employer was "negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." An employer is negligent if it "knew or should have known about the harassment, but failed to take prompt and adequate remedial action." Importantly, even if a remedial action does not effectively end the alleged harassment, it may still be legally "adequate" if it was "reasonably calculated" to do so.

Id. at *7 (citations omitted). "Title VII does not mandate a specified course of action for all instances of workplace harassment." Id. at *8. Moreover, a perfect process is not required.

The record establishes that the Hospital had a formal complaint procedure that was available and known to Plaintiff. After the Hospital was notified of Plaintiff's complaints of Stokes and Yuhas' conduct, an investigation was conducted, including interviews with Stokes and later with Yuhas, in which they were informed that their behavior was considered offensive by Plaintiff. In addition, the Hospital implemented a non-discrimination, anti-harassment training program for both its employees and the medical staff of the Hospital. The summary judgment record also reflects that no additional complaints against Stokes were filed by Plaintiff or any other Hospital employee. Therefore, even if the harassment by Stokes could be deemed sufficiently severe and/or pervasive to support a hostile work environment claim, the Court finds that there is no basis for holding the Hospital liable.

## Conclusion

For the reasons set out above, the Court will grant the Hospital's Motion for Summary Judgment [ECF No. 34]. An appropriate Order follows.

**ORDER**

**AND NOW**, this 5th day of December, 2013, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that Defendant's

Motion for Summary Judgment is **GRANTED** and Plaintiff's Complaint is dismissed in its entirety

with prejudice.

The Clerk of Court is **ORDERED** to mark this case closed.

By the Court,


*/s Cynthia Reed Eddy*
Cynthia Reed Eddy
United States Magistrate Judge

cc:    Joel S. Sansone
       Law Offices of Joel Sansone
       Email: joelsansone03@msn.com


       Bethany Swaton Wagner
       Jackson Lewis P.C.
       Email: bethany.wagner@jacksonlewis.com

       James A. Prozzi
       Jackson Lewis P.C.
       Email: prozzij@jacksonlewis.com